UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

HANNAH MOODY                                                    PLAINTIFF

V.                                      CIVIL ACTION NO. 3:19-CV-537-DPJ-FKB

WALMART, INC., ET AL.                                         DEFENDANTS

ORDER

Defendants Walmart, Inc., and Wal-Mart Stores East, LP (collectively "Walmart") seek summary judgment in this premises-liability case, and both parties ask the Court to exclude certain expert testimony.  Finding a genuine issue of material fact for trial, the Court denies Walmart's summary-judgment motion as to the premises-liability claim but grants its unopposed motion for summary judgment on the gross-negligence and punitive-damages claims.  Walmart's motion to exclude is granted in part, denied in part, and taken under advisement in part as explained below, and Moody's motion to exclude is denied.

I.      Facts and Procedural History

Close to midnight on September 3, 2016, Moody went to Walmart to purchase cookie dough.  She headed directly to the refrigerated-goods aisle, noting that Walmart employees were stocking shelves throughout the store.  After studying her cookie-dough options for a few minutes, suddenly and without warning, she found herself "on [her] back, sitting on the cookie dough" with one box on her chest, one on her leg, and several boxes lying on the ground nearby.  Moody Dep. [156-3] at 205.

The boxes apparently fell from a pallet jack that former Walmart employee Tony Ortega pulled past Moody.  The pallet jack was loaded with boxes of frozen bakery items Ortega was moving from the back of the store to the deli/bakery section.

According to Walmart's incident report, the boxes were stacked 10 high, and each weighed approximately five pounds.  Ortega did not personally stack the boxes on the pallet; some other unknown Walmart overnight associate(s) did.  But Ortega judged the pallet to be sufficiently "stable" to pull through the store.  Ortega Dep. [156-4] at 28.  He testified that it was not "particularly high or anything or even heavy."  Ortega Dep. [177-1] at 52.  Ortega did not perform a "bump" test by manually bumping the pallet to test its stability.  Ortega Dep. [156-4] at 13.  But he explained that to get the pallet from the freezer area out into the store, he had to maneuver it through "large, thick plastic curtains," make "two 90-degree turns," and go through "two double doors" that "swing kind of hard" such that "[i]f anything was going to come off, those two things would have taken them off."  *Id.* at 28.

As he passed through the refrigerated-goods aisle, Ortega saw Moody looking at the cookie dough.  According to him, he "said, 'excuse me,' and [] went around her with the pallet, and then [] heard some boxes fall."  *Id.* at 33.  When Ortega stopped and turned around, he saw "Moody kind of sitting on the cooler with a couple boxes on her."  *Id.*  He removed the boxes, apologized, and went to get store manager Kerry Alexander.  Alexander testified that, as far as he could recall, the pallet was not "overloaded or stacked too high."  Alexander Dep. [161-7] at 52.

Claiming she was injured by the falling boxes, Moody filed this lawsuit against Walmart on August 2, 2019, alleging premises-liability and general-negligence claims.  Am. Compl. [18] ¶ 12; *see id.* ¶¶ 14–31.  After discovery ended, Walmart moved for summary judgment, and the parties filed their *Daubert* motions.[1]  All motions have been fully briefed, and the Court has personal and subject-matter jurisdiction.

---

[1] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

II.     Summary-Judgment Motion

    A.     Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

B.      Analysis

Moody confessed her claims for gross negligence and punitive damages in response to

Walmart's summary-judgment motion, so the motion is granted as to those claims.  Pl.'s Resp.

[162] at 20.  That leaves only her premises-liability claim.

"Premises liability is a 'theory of negligence that establishes the duty owed to someone

injured on a landowner's premises as a result of conditions or activities on the land.'"  *Johnson v.*

*Goodson*, 267 So. 3d 774, 777 (Miss. 2019) (quoting *Doe v. Jameson Inn, Inc.*, 56 So. 3d 549,

553 (Miss. 2011)) (punctuation altered).  Under Mississippi premises-liability law, Moody was

Walmart's invitee on the evening of September 3, 2016.  *See Venture, Inc. v. Harris*, 307 So. 3d

427, 433 (Miss. 2020).  "A business owner owes a duty to an invitee to keep the premises in a

reasonably safe condition and to warn the invitee of dangerous conditions that are not readily

apparent."  *Id.* (quoting *Clinton Healthcare, LLC v. Atkinson*, 294 So. 3d 66, 71 (Miss. 2019)).

"There is no liability for injuries where the condition is not dangerous . . . ."  *Smith v. Fed.*

*Cleaning Contractors, Inc.*, 126 F. App'x 672, 674 (5th Cir. 2005).

"When a dangerous condition on the premises is caused by the operator's own

negligence, no knowledge of its existence need be shown."  *Munford, Inc. v. Fleming*, 597 So. 2d

1282, 1284 (Miss. 1992).  Where a plaintiff must prove knowledge, she satisfies her burden by

showing either actual or constructive knowledge.  *Id.*  Stated another way, to establish her

premises-liability claim against Walmart, Moody must show either "(1) that [Walmart's]

negligence injured her, (2) that [Walmart] had knowledge of the dangerous condition and failed

to warn her, or (3) that the condition existed for a sufficient amount of time so that [Walmart]

should have had knowledge or notice of the condition."  *Criss v. Lipscomb Oil Co.*, 990 So. 2d

771, 773 (Miss. Ct. App. 2008).  Moody appears to attempt all three routes.  *See* Pl.'s Mem.

4

[162] at 7 ("Walmart created a dangerous condition by moving a tall, unstable stack of boxes through its store on a pallet."); *id.* at 13 ("Walmart had notice of a dangerous condition.").

Walmart argues that a pallet with stacked boxes being pulled through a store is not a dangerous condition as a matter of law because "[c]onditions 'normally encountered' on business premises are generally not unreasonably dangerous." *Ware v. Frantz*, 87 F. Supp. 2d 643, 646 (S.D. Miss. 1999) (quoting *Tate v. S. Jitney Jungle Co.*, 650 So. 2d 1347, 1351 (Miss. 1995)). In particular, Walmart cites a Mississippi Court of Appeals decision (in a case against Walmart) where the court noted that "the presence of a hand truck is hardly unusual in a store like Wal-Mart, which moves high volumes of merchandise in a large area that is constantly in need of resupply." *Wal-Mart Stores, Inc. v. Littleton*, 822 So. 2d 1056, 1059 (Miss. Ct. App. 2002).

Walmart is correct that under Mississippi law, "dangers which are usual and which customers normally expect to encounter on the business premises, such as thresholds, curbs, and steps," cannot form the basis for a premises-liability claim when those "dangers" are in their normal, expected condition. *Venture*, 307 So. 3d at 433 (quoting *Tate*, 650 So. 2d at 1351). But this "categorical exclusion" does not apply to "defective conditions." *Cox v. Wal-Mart Stores E., L.P.*, 755 F.3d 231, 234 (5th Cir. 2014); *accord Venture*, 307 So. 3d at 435 ("[A] nondefective, temporary iron display rack would not typically constitute a dangerous condition. But its use, positioning and placement might.").

In *Cox*, the Fifth Circuit considered a "door threshold" at a Walmart that "was defective and was rocking up and down as people walked across it." 755 F.3d at 233. The district court granted Walmart's summary-judgment motion, finding that, under *Tate*, a door threshold was a usual and customary danger a shopper expects to encounter at a store. *Id.* at 233–34. The Fifth Circuit reversed, concluding that the existence of a defect in the threshold that caused it to

5

"suddenly r[i]se up one-half inch when Cox stepped on it" was "sufficient for a reasonable jury to conclude that it create[d] an unreasonable or unusually dangerous condition." *Id.* at 235. Here, the Court cannot say, as a matter of law, that a pallet jack stacked with inventory can never give rise to premises liability.

So, the question is whether Moody has demonstrated a question of material fact regarding the essential elements of her premises-liability claim. Moody—who did not see the pallet before the accident and did not know how high the boxes were stacked—says there is a fact question whether the boxes were unstable and stacked too high to be safely pulled through the store. She notes that the incident form states that the boxes were stacked 10 high and points to the following exchange from Ortega's testimony:

> Q. Okay. How big a box are we talking about?
>
> A. It's anywhere between a foot and a foot-and-a-half tall.
>
> Q. Do you have any idea on the dimensions, like lengths and width?
>
> A. Oh, and I want to take that back. It's two-by-four. So there's two packages [of muffins] side-by-side, and then it goes four high within the box.
>
> Now, the height and width, I'm not really sure without having the product in front of me. Just go to the deli/bakery and look for the banana nut muffins and the double chocolate chip muffins, and you can get one of those containers, put two over to the side, and that's about how long the box is, and then stack it four high. That's pretty much how you need to look at it.

Ortega Dep. [156-4] at 26–27. Moody takes the 10-boxes-high figure and multiplies it by Ortega's initial estimate regarding the boxes' height. From that, she concludes that "the boxes on the pallet were stacked up to 15 feet tall." Pl.'s Mem. [162] at 3. But as Walmart points out in reply, Ortega immediately retracted his initial estimate of the boxes' height.

Walmart's manager on duty that evening, Kerry Alexander, also testified about the dimensions of the boxes on Ortega's pallet. But because Ortega's pallet contained "a bunch of

different type stuff," Ortega Dep. [156-4] at 25, it is not clear whether Alexander was describing

all the boxes that were stacked on Ortega's pallet, or just the boxes of muffins that fell on

Moody.  *See* Alexander Dep. [177-2] at 43.

This record fails to paint a clear picture of how high the boxes were stacked on Ortega's

pallet or their stability.  Regardless, the Court must view the record in the light most favorable to

Moody, and the boxes were at least high enough to fall on her when Ortega passed with the

pallet.  The evidence also suggests that Walmart employees were responsible for stacking it.

While a close call, the Court finds a question of fact whether Walmart created a dangerous

condition.  Walmart's summary-judgment motion is denied as to the negligence claims.  *See*

*Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) ("[E]ven if the standards of Rule 56 are met, a

court has discretion to deny a motion for summary judgment if it believes that 'a better course

would be to proceed to a full trial.'"  (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255–56 (1986))).[2]

III.    *Daubert* Motions

A.    Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

---

[2] Because Walmart's motion has been denied, there is no need to address its argument that
Moody may not rely on "the doctrine of *res ipsa loquitur* in furthering her claims."  Defs.'
Mem. [157] at 13.  Moody never makes that argument—at least not by name—but her theory
seems to track it, and the issue may reappear at trial.  If so, the Court is not yet convinced by
Walmart's argument that *res ipsa loquitur* never applies in a premises-liability case because
Mississippi cases considering the doctrine in this context have not precluded its application.  *See,
e.g.*, *Huynh v. Phillips*, 95 So. 3d 1259, 1262 (Miss. 2012) (holding in premises-liability case
"that the evidence [was] not sufficient to raise a presumption of negligence under a theory of *res
ipsa loquitur*"); *Walz v. HWCC-Tunica, Inc.*, 186 So. 3d 375, 378 (Miss. Ct. App. 2016) (Griffis,
J.) (holding that *res ipsa loquitur* did not apply in premises-liability case because "there [were]
other reasonable inferences as to what caused Walz's fall").  If the issue resurfaces at trial, the
parties will need to brief it.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Whether a proposed expert should be permitted to testify under Rule 702 "is case, and fact, specific."  *Hodges v. Mack Trucks Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).  Under this rule, "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, [but] 'the rejection of expert testimony is the exception rather than the rule.'"  *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory committee notes to 2000 amendment).

B.      Walmart's Motion

Walmart asks the Court to exclude or limit testimony from four experts:  Dr. Richard Webb, Nurse Erica Flake, architect Fredrick Bremer, and engineer Traci Campbell.  The Court will take each expert in turn.

1.      Dr. Webb

Walmart seeks to limit the testimony of Dr. Webb, a pain-management doctor who treated Moody.  Specifically, Walmart seeks to exclude Dr. Webb's opinion that Moody was 36% impaired.  Dr. Webb reached this opinion using responses Moody provided to the Oswestry Low Back Pain Disability Questionnaire.[3]  Walmart says the opinion is "inherently unreliable" because it "is solely based on [Moody's] subjective answers to the questionnaire on one

---

[3] "The Oswestry Low Back Pain Disability Questionnaire is a validated questionnaire used by clinicians and researchers to quantify disability due to low back pain."  *Dunda v. Aetna Life Ins. Co.*, No. 6:15-CV-6232-MAT, 2016 WL 3552187, at *3 n.3 (W.D.N.Y. June 30, 2016).

occasion, that being November 11, 2020, more than four years after the subject accident and while in the throes of this ongoing litigation."  Defs.' Mem. [152] at 5.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.*, 826. F.2d 420, 422 (5th Cir. 1987)); *see Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) ("Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion.").  Moreover, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.  Walmart's motion is denied as to Dr. Webb.

### 2.     Nurse Flake

Erica Flake is a nurse practitioner who treated Moody for chronic pain and depression. According to Moody's expert designation, Flake is expected to testify

> that she diagnosed Ms. Moody with chronic pain and depression . . . and provided therapy and prescribed duloxetine and Prozac for Ms. Moody to treat her depression.  Ms. Flake is expected to testify that Ms. Moody's depression is related, in part, to Ms. Moody's limitations in her ability to provide childcare and household services due to chronic back pain.

Pl.'s Expert Designation [151-1] at 9–10.

Walmart first argues that Flake, a nurse practitioner, is not qualified to offer an opinion regarding medical causation.  *See Lee v. Jackson County*, No. 1:13-CV-441-HSO-RHW, 2017 WL 53952, at *8 (S.D. Miss. Jan. 3, 2017) (noting "majority rule that nursing experts cannot opine as to medical causation" (quoting *Vaughn v. Miss. Baptist Med. Ctr.*, 20 So. 3d 645, 652

(Miss. 2009))).  Moody confesses the point, and the motion is granted as to the causation opinions.

That leaves the question whether Moody may call Flake to testify regarding "the treatment she provided."  Pl.'s Mem. [167] at 6.  To the extent Moody intends to call Flake to testify as to her treatment of Moody's chronic pain, Walmart has not explained why the testimony should be excluded.  As for the depression treatment, Walmart says in reply that, without competent medical causation testimony linking Moody's depression to the incident at Walmart, Flake's testimony is not relevant.  *See* Def.'s Reply [178] at 2.  But Walmart cites no legal authority suggesting that expert testimony is always necessary to establish a causal link between depression and an accident (or that a plaintiff's own testimony is legally insufficient).  So, while Moody may need to lay a proper foundation, the Court will not at this point exclude Flake's testimony on this issue.

3.    Bremer

Moody designated Frederick Bremer "as an expert in the field of forensic consulting and architecture."  Pl.'s Expert Designation [151-1] at 10.  Bremer offers five opinions in his expert report:  four generally conclude that Wal-Mart created a hazardous condition that caused Moody's injuries, while the final opinion surmises that Moody acted reasonably.  This Order will examine each opinion after addressing a few threshold issues.

As an initial point, Walmart says, "with regard to all of his opinions, Mr. Bremer is not qualified to offer an opinion regarding the cause of Ms. Moody's injuries."  Def.'s Mem. [152] at 10.  Although Moody thoroughly addresses Bremer's qualifications to testify as an expert in the field of architecture and "the standard of care for safe grocery store operations and compliance," Pl.'s Mem. [167] at 7, those qualifications are not disputed.  By contrast, Moody fails to

adequately address whether Bremer is qualified to offer causation opinions.  Accordingly, those opinions will be excluded.

Walmart further contends that Bremer's opinions would not assist the trier of fact, since, in its words, "the opinions [Bremer] seeks to offer do not require professional, scientific, technical or other specialized knowledge that is beyond the understanding or ken of the typical juror."  Defs.' Mem. [152] at 7.  The comments to Rule 702 address this issue:

> Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier."  This question requires a "common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."  Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952).  When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.  7 Wigmore § 1918.

Fed. R. Evid. 702 advisory committee notes to 1972 proposal rules.  Thus, expert testimony is "unnecessary" if a jury can "adeptly assess [the] situation using only their common experience and knowledge."  *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990) (affirming decision to exclude expert testimony).

This Court faced the same issue in *Keyes v. Techtronic Industries Factory Outlets, Inc.*, where both parties designated expert witnesses to testify regarding an allegedly hazardous condition in a premises-liability case.  No. 3:18-CV-671-DPJ-FKB, 2020 WL 5592694, at *2 (S.D. Miss. Aug. 4, 2020).  The Court struck both experts because the jury could "examine the photographs and other evidence and reach their own conclusions about what happened."  *Id.* (citing *Clark v. Lard Oil Co., Inc.*, No. 2:18-CV-00109-KS-MTP, 2019 WL 4346544, at *4 (S.D. Miss. Sept. 12, 2019) (excluding expert whose opinions were "well within the purview of the jury's common experience and knowledge"); *Facille v. Madere & Sons Towing, Inc.*, No. 13-6470, 2014 WL 12719079, at *4 (E.D. La. Nov. 26, 2014) (excluding expert where the proffered

testimony "concern[ed] common sense issues with which the fact finder needs no expert assistance"); *Walker v. Target Corp.*, No. 2:16-CV-42-KS-MTP, 2017 WL 2604097, at *5 n.3 (S.D. Miss. June 14, 2017) (noting that jury in a slip-and-fall case is aware that condensation forms on cold objects based on common experience and knowledge and questioning whether expert testimony would actually help jury, but ultimately excluding expert as unqualified)). The same is true here.

The final threshold dispute relates to Bremer's attempt to testify regarding ultimate issues in the case, like whether Walmart created a hazardous condition and whether Moody acted reasonably. There is a critical distinction "between an impermissible opinion on an ultimate legal issue and 'a mere explanation of the [expert's] analysis which would tend to support a jury finding on the ultimate issue." *United States v. Keys*, 747 F. App'x 198, 208 (5th Cir. 2018) (quoting *United States v. Buchanan*, 70 F.3d 818, 833 n.20 (5th Cir. 1995)). While "[a]n opinion is not objectionable just because it embraces an ultimate issue," Fed. R. Evid. 704(a), "an expert may never render conclusions of law," *Goodman v. Harris County*, 571 F.3d 388, 399 (5th Cir. 2009) (citations omitted). And "allowing an expert to give his opinion on the legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983); *see also Hamilton v. McLemore*, No. 2:19-CV-47-KS-MTP, 2020 WL 4455168, at *2 (S.D. Miss. Aug. 3, 2020) (excluding testimony from expert who did "nothing other than review the evidence . . . and reach legal conclusions about the evidence"). As discussed next, Bremer simply chooses facts he wishes to accept—with no apparent scientific mythology—and then tells the jury what result to reach. This is not permissible. *Id.*

Having addressed the generally applicable impediments to admissibility, the Court will now address Bremer's specific opinions, which he offers to "a reasonable degree of architectural and technical certainty."  Bremer Report [151-5] at 14.

> a. The failure of Wal-Mart and their agents to properly operate a pallet jack, in accordance with Wal-Mart's standard operating procedures, and good practices, created a hazardous condition, which was a cause of Ms. Moody's being knocked off-balance by falling merchandise, [her] fall into the open bottom [of] an adjacent refrigerated case, and her injuries.[4]

Aside from Bremer's lack of qualifications to offer the causation opinions, his report merely repeats the facts then tells the jury what result to reach.  It is not apparent that those conclusions are based on scientific or technical support.  For example, he speculates that because Ortega saw Moody, he "steered the pallet trailing behind him out to his right in order to avoid her" and the boxes fell.  Bremer Report [151-5] at 6–7.  Maybe, but the opinion is not based on any testing or identifiable methodology, and speculative expert testimony is not permitted.  *See Bruner v. Cemex, Inc.*, No. 1:08-CV-1386-LG-RHW, 2010 WL 10567332, at *2 (S.D. Miss. Aug. 27, 2010) (rejecting speculative opinion that "unevenly adjusted brakes *could have* caused" the accident) (collecting cases).  Absent something more, the jury is perfectly capable of drawing its own conclusions from those same facts.  "[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."  *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1233 (5th Cir. 1986).  Bremer's theories about how Ortega may have caused the accident can be presented to the jury by counsel.

As for the Walmart policies Bremer cites, they are simple and would require no expert testimony to explain.  For example, it does not take an expert to understand the policy: "***Look for associates and customers when moving merchandise.***"  Bremer Report [151-5] at 8 (citing

---

[4] The headings quote Bremer's Report [151-5] at pages 14–15.

Walmart policy).  While some company policies might require explanation, Moody has not

shown that Bremer's testimony would assist this jury.  *See Keyes*, 2020 WL 5592694, at *2

(concluding that expert testimony regarding common-sense issues is unhelpful).

> b.  The failure of Wal-Mart and their agents to properly operate the
>     subject pallet jack when transporting merchandise while using the
>     subject pallet jack, as recommended by pallet jack manufacturer
>     Adaptalift, created a hazardously unstable condition, which was a
>     cause of Ms. Moody's being knocked off-balance by falling
>     merchandise, her fall into the open bottom [of] an adjacent refrigerated
>     case, and her injuries.

While Bremer's other opinions generally endorse Walmart's policies and fault Ortega for

ignoring them, here, he attacks Walmart's policy that instructs employees to pull pallet jacks

rather than push them.

Bremer supports this opinion by citing materials posted on the internet by a single

Australian company named Adaptalift.  *See* Bremer Report [151-5] at 10.  Adaptalift

manufactures pallet jacks, and its website does recommend that operators push the jacks

Adaptalift sells.  Though Ortega was not using an Adaptalift jack, Moody argues that Bremer

cited the materials "as an example of industry standard."  Pl.'s Mem. [167] at 17 n.1.  But

Bremer never states in his report that Adaptalift's recommendations constitute industry

standards, and he cites no other sources for this opinion.  This single website from an Australian

manufacturer related to a different product falls well short of showing Walmart's policies

violated industry standards in this country.

Finally, Bremer cites no studies or identifiable methodology supporting his conclusion

that pushing a pallet jack is safer than pulling one.  The opinion is not helpful to the jury, and he

lacks qualifications to address causation.

> c.  The failure of Wal-Mart and their agents to properly construct and
>     maintain stable merchandise when being transported by a pallet jack in
>     accordance with the nationally recognized industry standards, and

14

> Best's Underwriting Guide, Supermarkets, Accident Prevention Manual for Business and Industry, and Slips, Trips and Falls on Floors allowed a hazardous merchandise collapse condition to persist, which was a cause of Ms. Moody's being knocked off-balance by falling merchandise, her fall into the open bottom [of] an adjacent refrigerated case, and her injuries.

Again, this opinion is inadmissible for the generally applicable reasons stated above. In addition, none of the materials Bremer cites address merchandise falling from pallet jacks. Though that is not fatal, Moody essentially acknowledges that the cited standards are not an exact fit and says they are offered "as evidence of the duty owed." Pl.'s Mem. [167] at 19. But "[a]llowing an expert to draw legal conclusions from evidence—such as what duties a party owes and whether those duties were breached—is typically not helpful to the jury, i.e., does not present a relevant opinion." *Arredondo v. Flores*, No. CV L-05-191, 2008 WL 11393147, at *3 (S.D. Tex. July 7, 2008); *see also McBroom v. Payne*, 478 F. App'x 196, 200 (5th Cir. 2012) (noting that Rule 702 "does not permit experts to offer legal conclusions"). Premises-liability law dictates the duty Walmart owed Moody, and the Court will so instruct the jury. *See Mears v. Jones*, No. 1:17-CV-6-KS-MTP, 2019 WL 3483157, at *1 ("[I]t is the Court's job—not an expert witness's—to instruct the jury as to the applicable law.").

Finally, it is not apparent why expert testimony is necessary. In general terms, the materials Bremer cites suggest that merchandise should be stacked in a stable way to avoid "***falling and injuring*** . . . the customer." Bremer Report [151-5] at 12. That seems like a matter of common sense, and it is consistent with Walmart's own policies that the jury could consider. *See* Bremer Report [151-5] at 8 (quoting Walmart policy requiring employees to stack merchandise in a "stable manner"). The jury can assess the same facts Bremer references and make the same deductions that support his opinions.

> d. The failure of Wal-Mart and their agents to maintain a safe activity zone free from hazardous conditions, such as the movement of the

15

> subject pallet jack with improperly stacked and unsecured
> merchandise, . . . was a cause of Ms. Moody's being knocked off-
> balance by falling merchandise, her fall into the open bottom of the
> adjacent refrigerated case, and her injuries.

This opinion is based in part on <u>Human Dimensions and Interior Space</u>, which Moody describes as "a source book" recommending "a minimum of 36 in, in front of shelving . . . to accommodate a kneeling figure."  Bremer Report [151-5] at 13 (emphasis omitted).  Generously assuming that this requirement relates to the space needed when moving inventory—as opposed to the design of the store generally—Bremer offers no methodology supporting his conclusions about how the boxes came to fall on Moody, and his qualifications for offering causation opinions has not been established.[5]  Moreover, Bremer merely selects testimony he chooses to credit and then tells the jury what conclusion to reach on an issue the jury can readily grasp.  Such testimony is not helpful.

> e.    Ms. Moody was acting reasonably with the expectation of a safe
>         shopping experience when she was unexpectedly struck by the
>         subject falling boxes, which was a cause of her being knocked off-
>         balance by falling merchandise, her fall into the open bottom of the
>         adjacent refrigerated case, and her injuries.

Here again, Bremer lacks the qualifications to provide causation opinions.  Moreover, his opinions about what happened are based on conjecture; he offers no tests or methodology to support them.  Absent something more, Bremer is merely telling the jury what result to reach on an ultimate issue—whether Moody acted reasonably.  The jury can consider the same evidence and draw its own conclusions from it.  *See Keyes*, 2020 WL 5592694, at *2.

---

[5] Moody's other liability expert, Traci Campbell, opined that the store did have the required 36 inches of clearance and that Ortega should have been able to easily pass.  *See* Campbell Report [151-7] at 21.

16

Moody has not shown that expert testimony of the sort Bremer offers would assist the

jury in understanding the evidence or determining a fact in issue.  Fed. R. Evid. 702.  Walmart's

motion is granted as to Bremer.

        4.     Campbell

The final dispute over Moody's expert designations relates to Traci Campbell, an

engineer.  Walmart never disputes Campbell's qualifications but argues that the jury should not

hear the following 20 opinions from her lengthy report:

> 1.  Based upon the pedestrian kinematic analysis conducted, Ms. Moody was
> contacted by an outside force (versus something she initiated) causing her to
> experience a counter clock wise twisting motion that ultimately led to her landing
> on her backside in the lower level of the refrigerated cooler.
>
> 2.  Analysis demonstrated that there was more than sufficient aisleway space for
> Mr. Ortega to navigate the subject pallet into an area of the aisle that still would
> have provided for adequate clearance of the pallet as well as leaving ample
> walking space for Ms. Moody to continue her shopping.  Assuming a pedestrian
> aisleway space of 36 inches and a pallet size of 48 inches in width, there was still
> approximately 29 inches available for Mr. Ortega to maneuver the subject loaded
> pallet further to the right in the aisleway and away from the area where Ms.
> Moody was standing.
>
> 3.  Walmart, through their employee Tony Ortega, operated a loaded manual
> pallet jack within a close proximity of Ms. Moody and cause[d] her to fall and
> sustain injuries.
>
> 4.  Walmart, through their employee Tony Ortega, operated a loaded manual
> pallet jack within an unsafe distance from a pedestrian.
>
> 5.  Regardless of the actual mechanism causing the fall, either the stacked pallet
> impacting Ms. Moody or Ms. Moody bumping into the stacked pallet, Mr. Ortega
> did not have to operate the loaded manual pallet jack in such close proximity to
> Ms. Moody so as to not allow sufficient clearance between her and the stacked
> pallet.
>
> 6.  In spite of Mr. Ortega's testimony regarding issuing a verbal warning to Ms.
> Moody prior to the incident, this warning was ineffectual as Ms. Moody did not
> hear a warning nor did she acknowledge receiving the warning to Mr. Ortega.  In
> order for a warning to be effective, it must be perceived by the intended audience
> in order to have the opportunity to change your course of action.  That did not
> occur in this incident.

7.  If Mr. Ortega was traveling at a slow speed as he testified[] he was, Mr. Ortega had every opportunity to stop his stacked pallet prior [sic] after becoming aware of the presence of Ms. Moody and becoming in close proximity with her and he failed to do so.

8.  Walmart, through their employee Tony Ortega, did not follow the requirements of their own policy regarding Pulling Pallets to the Floor, in that Mr. Ortega [did not] stop the subject pallet prior to navigating into close proximity to Ms. Moody, in spite of having seen her well in advance of getting to her position and failed to ensure the pallet would safely clear the area where Ms. Moody was standing and shopping.  He did not utilize the open and available space to his right in the rear Action Alley that would have ensured room for Ms. Moody to access the aisle and provide for safe clearance of the loaded pallet.

9.  While Mr. Ortega testified that he issued a verbal warning to Ms. Moody, he did not adhere to Walmart's Safe Stocking Guidelines by looking out for customers while moving merchandise.  Had he been looking out for Ms. Moody; he could have moved the position of his pallet further to the right into the aisle and allowed her sufficient clearance between the cooler and the pallet.

10.  Tony Ortega failed in his responsibility and opportunity to let Ms. Moody know that he has a load and ask her to step aside and to exercise his opportunity to stop his travel prior to reaching her.

11.  Tony Ortega failed to follow the principles for safe operation of a material handling device similar to a forklift or motorized pallet jack set forth by the Occupational Health and Safety Administration by not allowing for sufficient safe clearances in aisles and paying adequate and sufficient attention to pedestrians in his working area.

12.  Tony Ortega failed to follow the principles for safe operation of a material handling device similar to a forklift or motorized pallet jack set forth by the American National Standards Institute in that he did not exercise good judgement to ensure the safe operation of his pallet jack, did not take additional safety precautions to ensure the safety of Ms. Moody while in close proximity to her, and did not safeguard Ms. Moody at all times while operating his pallet jack.

13.  Walmart failed in their responsibility to ensure adequate training of their Associates including Tony Ortega regarding proper and safe maneuvering of loaded and stacked pallets on the sales floor as evidenced by his voluntary close proximity to Ms. Moody despite ample aisle width to his right being available to him.

14.  Walmart management failed to adhere to their own policies regarding the Customer Incident Claims Process in that evidence (fallen boxes) were not taken into custody and preserved, photographs of the incident site prior to altering the

18

scene were not taken, and an accurate accounting of the merchandise that fell was not taken.

15.  Walmart management failed to follow the procedure outlined in the policy for Code White – Customer Injuries b[y] not photographing the incident scene and not correcting the unsafe Associate behaviors that were factors in the incident occurring.  A proper investigation was not conducted to determine the cause of the injury in order to take steps to prevent a repeat occurrence.

16.  Walmart management failed [to] follow their own policy to conduct a proper Accident Investigation within 7 days, or in this case at all, to determine "how" and "why" the incident occurred, identify the root cause, and determine steps to take in order to prevent the same or similar accidents from happening in the future.  Additionally, Mr. Ortega did not receive refresher or retraining on the proper procedures to move pallets of materials while keeping pedestrian[s] safe in the process after the incident.

17.  Walmart failed to adhere to multiple policies and Standard Operating Procedures regarding Accident Investigation and Review.

18.  Walmart failed to follow their own policies and Standard Operating Procedures regarding preventing falling boxes from injuring customers.

19.  Contrary to their own policies, Walmart, through their employee Tony Ortega, failed to avoid Ms. Moody with the loaded pallet jack as he moved through the store.

20.  Walmart failed in their responsibility to ensure that their employees, including Mr. Tony Ortega, were properly trained to move[] loaded pallets through a store safely and without harm to customers.

Campbell Report [151-7] at 21–23.  Walmart seeks to exclude all 20 opinions.

       a.    Opinion 1

Campbell's first opinion (that Moody was struck, experienced a counter-clockwise twisting, and came to rest on her backside in the cooler) is purportedly based on pedestrian kinematic analysis.  Walmart says this opinion is irrelevant and unreliable, but the Court will take it under advisement.

Assuming relevance, Walmart says Campbell is merely speculating.  As it notes, one of the "facts" undergirding her analysis is that "**[i]t is possible that if Ms. Moody was looking at**

**or reaching for an item that was located below her waist level**, her backside may have been extended into the aisleway more than her foot position."  Defs.' Mem. [152] at 15 (quoting Campbell Report [151-7] at 17) (emphasis added by Walmart).  Taking that assumption into account, Campbell opined that "[a] twisting motion rotating [Moody's] hips in a counter clockwise motion **could be initiated by** contact with the passing loaded and stacked pallet," and that "[i]t is **unlikely** the initiating twisting motion would have been caused by her . . . reaching into the cooler in front of her but would have required some degree of external forces acting upon her."  Campbell Report [151-7] at 18 (emphasis added).

"[A]n expert witness need not testify with absolute certainty."  *Spaulding v. United States*, 241 F. App'x 187, 190 (5th Cir. 2007).  But speculative expert testimony is not permitted.  *See Bruner*, 2010 WL 10567332, at *2 (rejecting speculative opinion that "unevenly adjusted brakes *could have* caused" the accident) (collecting cases).  Here, Campbell's ultimate conclusion in this opinion is that the twisting motion she describes "would have required some degree of external force."  Campbell Report [151-7] at 18.  That seems sufficiently certain.  But her underlying assumptions appear to speak more clearly to the parties' dispute.  Both sides seem to acknowledge that Moody made an 180-degree turn during the accident; she was initially facing the display and ended up sitting in it.  The difference is that Walmart thinks Moody may have backed into the passing pallet jack whereas Campbell says "[i]t is possible that if Ms. Moody was looking at or reaching for an item that was located below her waist level, her backside may have been extended into the aisleway more than her foot position," presumably creating the contact.  *Id.*  The Court will need to hear from Campbell regarding her methodology in reaching that conclusion.

b.      Opinions 2, 3, 4, 5, 11, and 12

Walmart groups opinions 2, 3, 4, 5, 11, and 12.  These opinions center on the width of the aisle and Campbell's opinion that, though the aisle was wide enough, Ortega pulled the pallet too close to where Moody was standing.  Moody says these opinions are based on ASTM industry standards and OSHA safety guidelines and will therefore "help the jury to understand the duty that Walmart owed."  Pl.'s Mem. [167] at 35.

Starting with Opinion 2—which states that Ortega had ample space to safely pass—the Court will allow this testimony.  Unlike Bremer's similar opinion, Campbell offers more relevant information supported by the dimensions of the aisle.  She also offers specialized knowledge regarding material handling and is a certified counter-balance forklift operator.  Her opinion regarding the space needed for safe passage is not necessarily within the knowledge of a lay juror and will help the jury decide a fact in dispute.  Walmart's arguments regarding the support for this opinion go to its weight.  *14.38 Acres of Land*, 80 F.3d at 1077 (holding that "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration").

Opinions 3, 4, 5, 11, and 12 essentially say that Ortega caused the accident by passing too closely.  Campbell explains that this violated Walmart's policies and other industry standards. Starting with Walmart's policies, the Court again finds that the jury can readily assess such simple directives and decide whether Ortega violated them.  Expert testimony would be unhelpful.  As for the OSHA and ASTM standards Campbell cites for safe passage, they are not perfect fits because they relate to powered jacks.  Campbell Report [151-7] at 18.  Campbell concedes as much but says those regulations are "closely correlated to" manual pallet jacks.  *Id.*

The Court finds that Walmart's objections go to weight and that Campbell's testimony regarding the contents of the industry standards would help the jury. *14.38 Acres of Land*, 80 F.3d at 1077.

That said, Campbell offers insufficient methodology to support her conclusion that Ortega violated these standards. At best, she seems to say that because the accident happened, Ortega must have been too close. Absent an opinion based on "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702(a), the jury is just a qualified to assess the facts and determine what happened. Walmart's motion is therefore granted in part and denied in part as to these topics and opinions.

c.     Opinion 6

Campbell's sixth opinion is that Ortega's verbal warning was ineffective because Moody did not hear it. As she puts it, "[i]n order for a warning to be effective, it must be perceived by the intended audience." Campbell Report [151-7] at 21. Walmart says the jury does not need "Campbell to explain that a warning is not effective if it is not heard." Def.'s Reply [178] at 9.

Walmart is correct. The warnings Campbell references relate to non-verbal warnings, but assuming they are relevant to the general duty to warn, the Court will instruct the jury that "[a] business owner owes a duty to an invitee to keep the premises in a reasonably safe condition and to warn the invitee of dangerous conditions that are not readily apparent." *Venture, Inc.*, 307 So. 3d at 433. Campbell has offered no "scientific, technical, or other specialized knowledge" that would assist the jury in finding that a verbal warning is ineffective if not heard. Fed. R. Evid. 702(a). This portion of the motion is granted.

d.     Opinions 7, 8, and 10

Opinions 7, 8, and 10 all relate to Ortega's failure to stop the pallet before reaching Moody. After Walmart argued that her opinions were somewhat contradictory, Campbell

22

submitted a clarifying affidavit explaining that Ortega could and should have stopped the pallet but did not.  Regardless of the precise substance of the opinions, the Court agrees with Walmart that "[t]he jury, using their common sense, can determine this issue, and no special expert knowledge is needed to help it do so."  Defs.' Reply [178] at 10.  That said, Campbell will be allowed to explain any relevant industry standards cited in her report.

> e.    Opinions 13 and 20

Campbell's 13th and 20th opinions concern Walmart's training efforts.  The opinions do not criticize Walmart's training in any particular way or specify what Walmart should have done differently.  Instead, Campbell essentially concludes that because Ortega failed to follow Walmart policy, Walmart must have failed to train him.  A lay jury is just as capable of connecting those two dots; the opinions are unsupported by any identified "scientific, technical, or other specialized knowledge."  Fed. R. Evid. 702(a).  Walmart's motion is granted as to these opinions.

> f.    Opinions 14 through 17

Opinions 14 through 17 discuss Walmart's failure to follow its policies after the accident. Walmart argues that they are not relevant because Moody does not contend that Walmart's post-accident conduct caused her injury.  In response, Moody says evidence of Walmart's policies regarding post-accident procedures—and of Walmart's failure to follow them—is relevant to show Walmart breached the standard of care.

Moody may have a point in terms of relevance because Walmart's alleged failure to follow its own policies might speak to the lack of evidence and a consciousness of guilt.  The Court will decide that issue later.  Regardless, expert testimony is not required for a jury to decide whether Walmart violated these simple policies.

g.     Opinions 18 and 19

Finally, opinions 18 and 19 are catch-all opinions that Walmart failed to follow its

policies and that Ortega failed to avoid Moody as he pulled the pallet through the store.  For the

same reasons stated above, Walmart's motion is granted as to Opinions 18 and 19.

C.     Moody's Motion

Walmart designated Dr. Stephen R. Southworth, a board-certified orthopedic surgeon, to

"testify and offer expert opinions regarding [Moody's] medical conditions and alleged injuries."

Defs.' Expert Designation [153-1] at 1.  Southworth reviewed Moody's medical records, the

pleadings, and Moody's discovery responses and reached the following conclusions, "stated . . .

to a reasonable degree of medical probability":

> [Moody] sustained some bruises in her fall of 9/3/16 but has no recorded history
> of findings consistent with significant or lasting spinal or appendicular trauma. . .
> .  She did not warrant, in the opinions of her multiple examiners, any advanced
> spinal imaging for more than two years after [the] alleged event, and that
> intervening history included a history of tobacco habituation, THC use (while
> breast feeding), obesity and repetitive heavy lifting.  It is medically improbable to
> attribute her non-traumatic, late MRI findings to an isolated, lower energy event
> on 9/3/16 from which she walked away unassisted, and overlook those chronic,
> multifactorial negative influences which are well documented in the medical
> literature to cumulatively case spinal disc desiccation, degeneration and
> degenerative disc protrusion.  In short, the plaintiff sustained a few bruises on
> 9/3/15, but no other documented significant or lasting injuries, and bruises heal in
> a matter of days to a few weeks.

Southworth Report [153-2] at 10.  Moody says Dr. Southworth should be excluded for two

reasons:  he provides no methodology or scientific support for his opinions, and he offers

speculation and possibilities rather than opinions to a reasonable degree of medical probability.

Starting with the former, Moody argues:  "Dr. Southworth does not name the

methodology he used to come up with his opinions, nor does he provide the scientific sources

upon which he relied.  Dr. Southworth only offers bare conclusions or mere *ipse dixit*."  Pl.'s

Mem. [154] at 3.

24

Moody is correct that Dr. Southworth does not list any medical treatises or medical studies upon which he relied in reaching his opinions in this case.  But Dr. Southworth explains that his "opinions are based upon [his] education, training, experience as a three-time board certified private practice orthopaedic surgeon, other education experiences as listed in [his] C.V., and to a reasonable degree of medical certainty."  Southworth Report [153-2] at 10.  Where a medical expert "base[s] his opinions on his interpretation of the medical records in light of his experience, training and expertise," it is admissible and "for the jury to weigh."  *Hubbard ex rel. Hubbard v. McDonald's Corp.*, 41 So. 3d 670, 678 (Miss. 2010); *accord Smith v. Starr Indem. & Liab. Co.*, 807 F. App'x 299, 302 (5th Cir. 2020) ("Questions relating to the bases and sources of an expert's opinions affecting the weight to be assigned that opinion rather than its admissibility should be left for the jury's consideration."); *see also Hill v. Mills*, 26 So. 3d 322, 332 (Miss. 2010) ("[P]eer-reviewed materials are not an absolute requirement, and their absence does not constitute automatic inadmissibility.").[6]

Turning to her second objection to Dr. Southworth's opinions, Moody says that "Dr. Southworth proposes to offer medical causation testimony on what may have caused Plaintiff's injuries," and that he has identified "three possible causes . . . :  (1) smoking; (2) obesity; and (3) lifting her child."  Pl.'s Mem. [154] at 6.  She argues that the "testimony should be excluded because it improperly offers possibilities instead of probabilities."  *Id.*  But Moody misreads Dr. Southworth's report.  Dr. Southworth is not suggesting that smoking or obesity or lifting caused the back problems Moody is suffering.  Instead, he opines, based on his education, training, and

---

[6] Unlike in *Hill*, Moody has not presented the Court with any documentation contradicting Dr. Southworth's opinions.  26 So. 3d at 332 (finding unreliable and inadmissible expert opinion where "one hundred percent of documentation presented to the trial judge contradicts [the expert's] opinion").

experience, and "to a reasonable degree of medical certainty," that Moody's back issues are "degenerative" in nature and therefore more likely to be due to a combination of smoking, "THC use," "obesity[,] and repetitive heavy lifting," than to the September 2016 fall in Walmart. Southworth Report [153-2] at 10.  Dr. Southworth's opinions are admissible, and Moody can address their weight on cross examination.

IV.     Conclusion

The Court has considered all arguments.  Those not addressed would not have changed the outcome.  As explained above, Walmart's Motion for Summary Judgment [156] is granted as to the claims for gross negligence and punitive damages but otherwise denied.  Walmart's Motion to Exclude [151] is denied as to Dr. Webb, granted in part and denied in part as to Nurse Flake, granted as to Bremer, and granted in part, denied in part, and taken under advisement in part as to Campbell.  Moody's Motion to Exclude [153] is denied.

Finally, now that the Court has addressed these issues, the parties are instructed to discuss whether the previous settlement conference should be resumed or the case can otherwise be settled before the pretrial conference.

**SO ORDERED AND ADJUDGED** this the 27th day of October, 2021.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE